**THE MARGARET. THE MANCHESTER MERCHANT. HUSDON et al. v. A. H. BULL S. S. CO. et al.**

District Court, E. D. Pennsylvania. July 11, 1927.

**1. Collision 102(2)—Vessel attempting port to port passing in narrow channel held equally at fault with other, not sounding danger signal or stopping.**

Vessel attempting to force a port to port passing in a narrow channel *held* equally at fault for collision with other vessel, which was

negligent in not sounding danger signal and in not stopping when first vessel refused to accept signals for starboard to starboard passing.

**2. Collision ⇐115—Owner of tug, whose master, in piloting one of colliding vessels, was not acting within scope of his general employment, held not liable.**

Owner of tug, whose master, in going aboard vessel as pilot, was acting independently as one in employ of vessel, and not within scope of general employment, *held* not liable for collision resulting from his faulty navigation.

In Admiralty. Libel for collision damages by the A. H. Bull Steamship Company, as owner of the steamship Margaret, against the steamship Manchester Merchant, with cross-libel by J. H. Husdon, master, etc., and the Manchester Liners, Limited, owner, etc., of the British steamship Manchester Merchant, against the American steamship Margaret, the A. H. Bull Steamship Company, claimant, wherein the Independent Pier Company and another were impleaded. Decree in accordance with findings.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), and Rawle & Henderson, of Philadelphia, Pa. (Joseph W. Henderson, of Philadelphia, Pa., of counsel), for libelant, A. H. Bull Steamship Co.

Biddle, Paul, Dawson & Yocum, of Philadelphia, Pa. (H. Alan Dawson, of Philadelphia, Pa., of counsel), for libelants, J. H. Hudson and Manchester Liners, Limited.

Acker, Manning & Brown, of Philadelphia, Pa. (J. Thruston Manning, Jr., of Philadelphia, Pa., of counsel), for impleaded respondents Independent Pier Co. and others.

DICKINSON, District Judge. The conclusion reached is that each and both the Manchester Merchant and the Margaret were guilty of negligence, and that the tug Harry M. Wall was not in charge of the Margaret, nor was the Independent Pier Company, the owner of the tug, responsible for the navigation of the Margaret.

### Discussion.

We have entitled this cause as set forth in the libel proceeding first instituted. There are, however, three causes in one. There is a claim for damages by the ship Margaret against the Manchester Merchant. There is likewise a cross-libel, in which the parties are reversed. There is further process to bring into the dispute the Independent Pier Company and the tug Harry M. Wall, on the averment that, when the collision occurred out of which the opposing claims arise, the Margaret was in charge of the tug, and hence her owners answerable for negligent management.

It would be not only a great help, but a gratification, if, in collision cases, some uncontested fact appeared which would serve as a footing from which to advance to the finding of the responsible cause of the occurrence. As is usual in admiralty cases, we are without this aid in this case. If, for illustration, the simple fact of where the collision occurred were not in controversy, we would have a starting point. As it is, each party fixes it at a place which supports the theory of its own innocence and the guilt of the other. A substitute might be found in the testimony of some disinterested witness, who saw what happened. There are few exceptions to the rule that in admiralty cases no such persons exist, for the reason that all spectators are partisans. The nearest approach to an impartial witness is one who has no selfish money interest in the final outcome. Such a witness is here found in the person of the master of a tug which was near at hand before the collision. With the aid of the evidentiary facts brought to our mind by this witness, we are able to judge between the opposing theories of the parties and to distribute the blame.

The fact situation thus found is this: The two vessels were moving in the Delaware river, the Margaret bound in and up, and the Merchant down and out. The Margaret started below, and the Merchant above, the Delaware river bridge. They met a short distance above it. The channel is from 800 to 1,000 feet wide, and hugs the western or Pennsylvania shore so closely that the line of the pier heads on the Philadelphia side of the river marks the western limits of the channel. The Margaret was loaded, and was drawing 18 feet of water. The Merchant was light, with a draught forward of 12 feet and aft of 14 feet. The time of year was January 19, 1926, and of day just before sunrise. The ships displayed the usual lights shown on vessels when under way, but there was daylight enough to make out objects, so far as this bears upon what happened.

The Margaret's theory is that she was following the channel, keeping to the eastward of the middle line of it. She made out the Merchant coming down the river, when some distance away, and noted that the Merchant bore off the Margaret's starboard bow so much as to place the Merchant well to the eastward of the Margaret and to suggest a starboard to starboard passing. Ahead of

22 F.(2d) 709

and going in the same direction, and to the westward of the Merchant, was a tug with a houseboat in tow. The expectation was that the Margaret would first pass the tug. Signals were accordingly exchanged between the Margaret and the tug for a starboard to starboard passing.

The evidence establishes with satisfactory clearness the fact of the exchange of these signals, and in the view we have taken this takes on controlling significance. The Merchant was making about twice the speed of the tow, and passed the latter just as the above-mentioned signals were exchanged. The Merchant is in consequence bound to have noticed them. The Merchant, it will be remembered, had the tow close aboard on the Merchant's starboard hand. The Margaret, seeing that she would pass the Merchant before she passed the tug, then signaled the Merchant for a starboard to starboard passing, to which the Merchant responded with (as is asserted by the Margaret) an accepting signal of two blasts. All this spelled apparent safety, as it meant that the Margaret would pass both the Merchant and the tow starboard to starboard, and further from the Merchant than from the tow. The Merchant put her helm slightly to starboard, so as to conform to this maneuver, when suddenly the Merchant crossed signals by sounding one whistle, to which the Margaret answered with two, and the Merchant replied by again sounding one and cut across the bow of the tug, which she had just passed, and attempted to cross the bow of the Margaret to get to the westward. This brought about grave danger of a collision, which the Margaret sought to avert by reversing her engines. The ships came together about 1,000 feet off the pier head line, which placed the Margaret well to her side of the channel.

It is unnecessary to place the responsibility under this version of the facts, because the resourceful proctor for the Merchant himself says that, with such a fact situation presented, the Merchant was not merely to blame, but those responsible for her handling deserved to be sent to jail.

The theory of the Merchant begins with the statement of a fact which might seem to be an exception to the rule of conflict to which we have adverted, because it agrees with the statement of the Margaret that she was well east of the middle line of the channel. The exception is of that type which is commonly said to prove the rule, because the agreement may be wholly due to the circumstance that each side is advancing a fact statement which each thinks to bear out its theory, and the agreement is no real agreement upon a fact version, but is a mere coincidence. The Merchant further places herself well on her side of the channel, and indeed to have been within 300 feet of the pier head line. The fact that to those aboard the Margaret the Merchant bore on the Margaret's starboard bow is asserted to be of no significance, because of the fact that the channel in the space between the two ships swerves as much as four or five points to the eastward as you follow it upstream.

What the Margaret should have had in mind was, not the position in the channel which the Merchant seemed to occupy when the arc of the bend separated the two ships, but what her place in the channel would be when the vessels met in passing. It was the duty of each vessel to observe the narrow channel rule to keep to her side, and this rule the Merchant obeyed by holding her helm so that she would hug the pier head line. This meant the ordinary port to port passing, and the signal for this was given by the Merchant. The fact that this threw her across the bow of the tug is of no significance, because she was moving at twice the speed of the tow, and the latter made no complaint of the maneuver, for which there was ample space. Instead of accepting the port to port passing signal, the Margaret answered with two whistles, to which the Merchant replied by repeating the one-whistle blast. By this time danger was in sight, which the Merchant sought to meet by putting her helm hard aport and her engines full speed astern. The ships collided so near the piers that the Merchant barely escaped running into one by being brought up by the anchor which she had dropped. This puts upon the Margaret the blame for creating a dangerous situation, in the emergency effort to escape which the Merchant cannot be visited with fault.

We are thus drawn to look for facts which can be found, without attempting to choose between the contradicting versions of the parties. The difficulty in denying a finding that the Margaret was to the eastward of mid-channel is created by the circumstance that both parties so assert the fact to be. There is a controversy over the position of the Merchant, and unfortunately the master of the tug made no statement as to the position of the tug. The Margaret may, however, be placed close to mid-channel, the width of which at the place of collision could be found to be little, if any, over 800 feet. The Merchant might be placed at least 300 feet off the pier head line. Assuming the ships to have been holding parallel courses in reverse,

the distance of the line of one course from the other would not have exceeded 100 feet. This left no space to maneuver out of a confusion of signals.

We accordingly make no finding of the position of the respective ships in respect to the channel, beyond the general finding that they were approaching each other, so that there might have been a signal for either a port to port or starboard to starboard passing. We find the latter, because of the fact that the Margaret and the tow were in signal agreement upon this. Here is to be found the key to the whole controversy. The Merchant was so close at hand when the tow and the Margaret exchanged signals that she was bound to take notice of them and of the situation thereby created. This was that the tow, which was at least some 150 feet nearer the course of the Margaret than was the Merchant, would try to pass to the eastward. If the Merchant went to the westward, she must pass between the tow and the Margaret, thus cutting the view of each of the other, and at the same time force the Margaret to go to the eastward. The inevitable consequence would have been to have brought the Margaret into collision with the tow, or into imminent danger of it. The plain duty of the Merchant, as we find it to have been, was either to have accepted the Margaret's signal of a starboard to starboard passing, or to have sounded a danger signal and to have reversed her engines. Her fault was, we assume, in not taking notice that the Margaret could not accept a port to port passing of the Merchant without conflicting with the already agreed on starboard to starboard passing of the tow. This we find to have been negligence which contributed to the resulting damage.

Returning to the Margaret, she had agreed with the tow to keep to the westward; the Merchant was insisting that the Margaret go to the eastward, which she could not safely do. We find that the Margaret, in this predicament, should have sounded a danger signal and reversed, in failing to do which she was guilty of negligence, which likewise contributed to the damage done.

The question of the responsibility of the Independent Pier Company for the navigation of the Margaret turns upon a fact finding. If the brought in respondent was in charge, and was taking the Margaret to her landing pier, responsibility could not be escaped. On the other hand, if the Margaret was in her own hands, this respondent would not be answerable for the consequences of the fault of her navigators, notwithstanding the fact that a tugboat captain assisted in the navigation, and the further fact that he happened also to be in the general employ of the respondent.

Our finding is that the master of the tug, in going aboard the Margaret and there acting as her pilot, was not acting within the scope of his employment by the intervening respondent but was acting independently as one in the employ of the vessel. The conclusion reached is that this respondent is not responsible for the acts of the pilot of the Margaret.

We accordingly make the following findings:

[1] 1. The Manchester Merchant was guilty of negligence in attempting to force a port to port passing of the Margaret, and thereby contributed to the damage done by bringing about the collision of the two ships.

2. The Margaret was guilty of negligence in not sounding a danger signal, and in not stopping when the Manchester Merchant refused to accept the signals for a starboard to starboard passing, and that this negligence contributed to the damage done.

[2] 3. The pilot of the Margaret was not acting within the scope of his employment with the Independent Pier Company, but was acting independently and for the time being in the employ of the vessel.

4. A form of decree in accordance herewith may be submitted.